In re GAS RECLAMATION, INC.
SECURITIES LITIGATION.

No. M21–41 (LBS).
MDL No. 665 (LBS).

United States District Court,
S.D. New York.

April 9, 1987.

Geary, Stahl & Spencer, Dallas, Tex., for Allen Investors; Douglas M. Robison, of counsel.

Kantor, Davidoff, Wolfe, Rabbino & Kass, P.C., New York City, for Bard Investors; Robin Nelson Wolfe, William K. Sanders, of counsel.

Sylvor, Schneer, Gold & Morelli, New York City, for Abish Investors; Richard L. Gold, Iris S. Richman, of counsel.

Alvin A. Simon, Yonkers, N.Y., for Michael DeBlasio.

Hirsch & Westheimer, P.C., Houston, Tex., for Ditto and Clarke Investors, June E. Johnson, Fred Parks, and Allibone Investors; Joe C. Holzer, of counsel.

John W. Berkel, P.C., Houston, Tex., for Robert Hudson.

Cadwalader, Wickersham & Taft, New York City, for Intercontinental Monetary Corp., Richard H. Kelly, Edgar R. Eisner, and Laurance H. Friedman; Earl H. Nemser, Rosemary Byrne, of counsel.

Mark B. Brenner, New York City, Morris & Campbell, Houston, Tex., for Haas Securities, Robert A. Spira, Eugene K. Laff, Joe A. Clements, Edward Rotenbury, Don Reel, and G.A. Sumon; Kenneth M. Morris, John R. Knight, Houston, Tex., of counsel.

Owen & Fennell, New York City, for Connecticut Nat. Bank, Morris County Sav. Bank, Ensign Bank FSB, and Privatbanken A/S; Darrell K. Fennell, Robert Owen, of counsel.

Munves, Tanenhaus & Storch, New York City, Sutherland, Asbill & Brennan, Atlanta, Ga., for Financial Guar. Corp. and A. Emmett Barnes IV; Steven G. Storch, New York City, John Chandler, Atlanta, Ga., of counsel.

Adler, Hindy, Turner, Glasser & Weiss, New York City, for Austin Davenport Associates, Inc., Hugh Bell, Howard Reifer, James J. Callahan, and Management Con-

sulting Group, Inc.; Theodore G. Eppenstein, Lawrence B. Carlson, of counsel.

Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, New York City, for Northwestern Nat. Ins. Co. of Milwaukee, Wis.; Gregor F. Gregorich, Clifford R. Saffron, of counsel.

Cahill, Gordon & Reindel, New York City, for Peat, Marwick, Mitchell & Co.; George Wailand, Kevin J. McKenna, of counsel.

Howard B. Butler, Jr., Houston, Tex., for Gas Reclamation, Inc., G. Hugh Bradbury, Gordon D. Lewis, M.D., Harrison A. Storms, Jr., Michael A.S. Makris, and Bob L. Jordan.

SAND, District Judge.

## I. FACTS AND PARTIES TO THIS LITIGATION

This proceeding, which consists of at least ten separate lawsuits and approximately eighty plaintiffs and fifty defendants, comes before us for purposes of all pretrial matters pursuant to 28 U.S.C. § 1407 (1982) and an Order of the Judicial Panel on Multidistrict Litigation. Following transfer to this Court, plaintiffs filed a Consolidated Complaint and an Amended Consolidated Complaint, the latter relating to only one of plaintiffs' sixteen causes of action. We consider these two complaints in tandem in deciding the motions to dismiss and for summary judgment now before the Court.

Plaintiffs' ("Investors") claims arise from their purchase of Gas Reclamation Units ("Units") from defendant Gas Reclamation, Inc. ("GRI") pursuant to a Private Placement Memorandum ("PPM") dated April 12, 1984. In addition to GRI and certain of its officers and agents, the defendants named in the Consolidated Complaint include: various brokerage houses and investment advisors; a number of banks that financed Investors' notes; the insurance company that issued bonds to secure the notes and its insurance agent; an accounting firm hired by GRI to conduct certain financial and management services; and a number of individuals associated with these parties. Plaintiffs allege that these defendants perpetrated and aided and abetted a securities fraud that affected approximately 400 investors throughout the United States.

The Units sold by GRI to investors consisted of an agreement to purchase from GRI a gas recovery and refrigeration plant and an agreement that GRI would install and maintain the plant on behalf of each investor. The gas plants attached to natural gas wells and were to condense the natural gas through refrigeration into liquid natural gas. GRI was to market the liquid natural gas, with investors sharing in resulting profits.

The total consideration for each Unit varied between $79,000 and $83,000. Typically, investors paid five percent in cash. The balance was funded pursuant to the terms of certain promissory notes which investors executed concurrently with the purchase of the Units and for which plaintiffs paid a commitment fee. The notes were "payable to or ultimately endorsed" over to one of several banks—either Privatbanken, Intercontinental ("IMC"), Connecticut, Ensign, First City or Morris County (hereinafter collectively referred to as the "Banking Parties"). Consolidated Complaint ¶ 64. In connection with the execution of these promissory notes, investors were required to execute bonding agreements so that Northwestern National Insurance Company ("Northwestern") would issue bonds securing payment. Peat, Marwick, Mitchell & Co. ("Peat Marwick") is alleged to have rendered accounting services to GRI in connection with the sale of Units.

The Consolidated Complaint alleges that each of the Investors was fraudulently induced to invest in GRI as a result of a securities fraud perpetrated through nineteen misrepresentations and thirty-five omissions made in connection with the offering. These omissions and misrepresentations were allegedly made by the so-called "GRI Parties" and "Broker Parties," the latter consisting of Haas Securities Corp. ("Haas"), Austin Davenport Associates, Inc. ("Austin Davenport"), Management Consulting Group, Inc. ("Manage-

ment Consulting"), and some of their agents. In addition, the Investors allege that through a variety of acts the Broker Parties, Banking Parties, Northwestern and its agent Financial Guaranty, Peat Marwick, and others "substantially assisted or participated" in the primary securities law violations of GRI and the Broker Parties. The alleged misrepresentations and omissions of material fact involve, *inter alia,* the production capability of gas plants, their worth, and past performance; GRI's ability to market the natural gas; the expenses associated with the offering; the terms of investors' financing; the need for registration with the Securities and Exchange Commission ("SEC"); and the involvement of certain persons with the offering.

GRI filed for Chapter 11 Bankruptcy in February 1985. The following month, and continuing through February 1986, investors filed suit asserting numerous federal and state statutory and common law claims.

## II. MOTIONS TO DISMISS

The Broker Parties, Banking Parties, Northwestern, Peat Marwick, and Financial Guaranty have moved to dismiss Investors' Consolidated Complaint. Financial Guaranty's motion to dismiss was converted to a motion for summary judgment by this Court. That motion will be addressed separately, following a discussion of the arguments set forth by the other defendants in support of their motions to dismiss under Rules 12(b)(6) and 9.

In considering these motions to dismiss, the court of course is bound by well established principles: the court should not dismiss the complaint pursuant to Rule 12(b)(6) "unless it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985). Furthermore, the court is restricted to evaluating the face of the pleading. *Id.*

### A. *The Gas Reclamation Systems are Securities*

Defendant Peat Marwick claims that this Court lacks subject matter jurisdiction over the Investors' claims because in its view, the gas reclamation units purchased by Investors are not "investment contracts" and therefore securities within the purview of the federal securities laws. *See* 15 U.S. C.A. § 77b(1) (West Supp.1986). The court in *Securities and Exchange Comm'n v. W.J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946), held that "[a]n investment contract ... means a contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits solely from the efforts of the promoter or a third party...." Peat Marwick contends that the reclamation plants do not satisfy the second, "common enterprise" requirement as set forth in *Howey.* We disagree.

As noted by both parties, this Court recently reviewed the three tests employed in this Circuit to determine whether a "common enterprise" is present—the "broad vertical commonality," "narrow vertical commonality," and "horizontal commonality" tests. We agreed with other courts in this district which rejected the "broad vertical commonality" test as inconsistent with *Howey. Cahill v. Contemporary Perspectives, Inc.,* [1986–87] Fed.Sec.L.Rep. (CCH) ¶ 92,720 (S.D.N.Y.1986) [Available on WESTLAW, DCT database]. The Court finds no need to revisit that issue here, particularly in view of the Court's conclusion that the reclamation units meet the requirements for one of the other two applicable standards, that of "narrow vertical commonality."

The standard for narrow vertical commonality as articulated by the court in *Mechigian v. Art Capital Corp.,* 612 F.Supp. 1421, 1426–27 (S.D.N.Y.1985), requires a tie between the fortunes of the investor and the investment's promoter such that these fortunes rise and fall together. *See also Cahill* [1986–87] Fed.Sec.L.Rep. at 93,491; *Savino v. E.F. Hutton & Co.,* 507 F.Supp. 1225, 1237 (S.D.N.Y.1981). The investment at issue here required that each investor purchase one or more gas reclamation

plants, or "Units," from the promoter, GRI. The investor thereafter would receive 62 percent of the gross profit resulting from sales of liquid gas obtained from his particular Unit, with the remaining profit retained by GRI as its fee for operating the Unit at the well site. While the contract required GRI to maintain the well site, any costs of the well system exceeding GRI's 38 percent share of profits were borne exclusively by the investor.

Peat Marwick does not dispute that under this arrangement GRI's fortunes would indeed rise with its investors by reason of profitable yields from the reclamation units. Rather, Peat Marwick bases its conclusion that there is no vertical commonality on its opinion that the "Investors seem to have overlooked ... that GRI would not share in the investors' losses in the event that the plants were not successful." *See, e.g., S.E.C. v. Goldfield Deep Mines Co. of Nevada,* 758 F.2d 459, 463 (9th Cir.1985) (profit-splitting arrangement where promoter's and investor's fortunes were dependent on promoter's unique ore processing technique and both profits and losses shared, held to be investment contract). Peat Marwick relies on the proposition previously cited in a footnote by this Court, that where the fortunes of the promoter-defendants would not *fall* with that of the investors, that is, where " 'defendants could do no worse than maintain their position after the purchase,' " the test of narrow vertical commonality has not been fulfilled. *Cahill,* [1986–87] Fed.Sec.L.Rep. at 93,491 n. 1 (quoting *Mechigian,* 612 F.Supp. at 1427). Peat Marwick therefore contends that since the investors ultimately bore costs connected with their Units that exceeded GRI's 38 percent share of profits, the test has not been met here.

◼ Peat Marwick's interpretation of the narrow vertical commonality test is too limiting to support a reasonable definition of a "common enterprise" and hence an investment contract under the securities laws. First, it is clear that GRI's fortunes would in fact literally "rise and fall" with those of the investors depending on the varying level of profits derived from the reclamation units over time, regardless of the apportionment of losses in the event of a shortfall. This concept was recognized by the court in *Savino,* 507 F.Supp. at 1230, 1239, a case which found vertical commonality. There, the plaintiff investor agreed to pay his stockbrokers a bonus equal to ten percent of the profits obtained from their management of his stock option account although losses accrued solely to the plaintiff. *Id.; accord Silverstein v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 618 F.Supp. 436, 438–40 (S.D.N.Y.1985) (no common enterprise existed where commissions on a trade by trade basis were the only compensation derived from plaintiff's account).

Furthermore, the only two cases cited by Peat Marwick for the proposition that there is no vertical commonality where "defendants could do no worse than maintain their position after the purchase" can be easily distinguished from the case at hand. *Mechigian,* 612 F.Supp. 1421 (S.D.N.Y.1985), involved plaintiff's one-time purchase of a lithographic plate from defendants who were to market the artwork. Plaintiff's unsuccessful allegations of a common enterprise were grounded solely on the alleged commonality of interest in the success of the venture resulting from the utilization of nonrecourse financing where there had been an artificially inflated purchase price. The deal did not contemplate a long-term profit-splitting arrangement as in the instant case.

Similarly, this Court's decision in *Cahill,* [1986–87] Fed.Sec.L.Rep. at 93,491, involved sale of the print films for manufacture of books funded in large part by nonrecourse promissory notes. We based our decision that there was no vertical commonality creating a common enterprise between buyer and seller on our opinion that their fortunes were not tied together—the contract provided that royalties were to be shared not during the entire course of the venture as in the case at hand, but only until the nonrecourse mortgage was paid off, after which time the purchaser was to take all. We subsequently added in a footnote *Mechigian*'s observation that there is no narrow vertical commonality where de-

fendants can do no worse than maintain their position after the purchase.

■ That proposition, however, cannot be interpreted to be an absolute condition of an investment contract. Unlike the present case, in neither *Mechigian* nor *Cahill* did the promoter and investor share indefinitely in the venture's profits. In both cases, it was the absence of such indefinite profit-sharing that was sufficient to disqualify the arrangements as investment contracts under the securities laws. The courts did not need to decide whether the seller could do no worse than maintain its position in order to conclude that the instruments at issue were not securities. In *Cahill*, the court simply observed that this was the case, without making it the basis of its decision. To the extent, if any, that *Mechigian* held this factor dispositive, the Court must disagree. A contract where the promoter's and buyer's fortunes are forever linked by profit-sharing, even when losses are not shared, can be an investment contract and hence a security. *See, e.g., Savino,* 507 F.Supp. at 1239.

In this sense, the investment at issue here resembles the transaction involved in *In re Energy Systems Equipment Leasing Securities Litigation (No. MDL–637),* 642 F.Supp. 718, 736 (E.D.N.Y.1986), which the court found to be an investment contract for purposes of the securities laws. There, the investor entered into long-term lease and service agreements involving energy conservation devices. Under the agreement, the investor leased the system from the promoter, who first undertook to locate an end-user for the conservation device, and then installed and maintained the system. Revenues based on profits realized from the energy savings of end-users were shared between the promoters and the investors. However, the arrangement contemplated that the investor would pay rent to the promoter even if the promoter failed to successfully market the system to end-users. Although the investor alone bore this risk of loss, the court held, and we so conclude in the instant case, that the investors fortunes were "inextricably and direct-

ly tied" to the fortunes of the promoters. *Id.* at 736.

Because we find that an investment contract exists under the test for narrow vertical commonality, the Court need not reach the parties' arguments with respect to the question of horizontal commonality. Furthermore, because the scheme here is an investment contract and thus a security under federal law, it similarly qualifies as a security under both the Martin and Texas Securities Acts. *See, e.g., Cahill,* [1986–87] Fed.Sec.L.Rep. at 93,491; *Westchester Corp. v. Peat, Marwick, Mitchell & Co.,* 626 F.2d 1212, 1216–17 (5th Cir.1980).

### B. *Section 10(b)*

1. *Primary Violations by the Broker Parties*

■ It is settled law that a plaintiff in an action under section 10(b), 15 U.S.C. § 78j(b)(1982), or Rule 10b–5, 17 C.F.R. § 240.10b–5 (1986), must allege that the defendant has misrepresented or omitted to state material facts in connection with the purchase or sale of a security, that the plaintiff relied upon such misrepresentations or omissions to his detriment, and that the misrepresentations or omissions were made with scienter. *See, e.g., Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985); *Savino v. E.F. Hutton & Co., Inc.,* 507 F.Supp. 1225, 1231 (S.D.N.Y.1981). In the context of Rule 10b–5, scienter includes an intent to defraud, the knowing use of a device, scheme, or artifice to defraud, and at least where there is a fiduciary duty, reckless disregard for the truth. *See, e.g., Lanza v. Drexel & Co.,* 479 F.2d 1277, 1301 (2d Cir. 1973) (en banc); *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 44 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

The Broker Parties, and in particular Austin Davenport and Management Consulting, as well as certain of their agents and employees named in the Consolidated Complaint, contend that plaintiffs have not presented any facts with respect to the alleged wrongdoing of these defendants under section 10(b), and move for dismissal under Rule 12(b)(6) and 9(b).

■ However, it is apparent that the complaint affords these defendants fair notice of the nature of plaintiffs' claims and the grounds upon which they rest. *Credit & Finance Corp. Ltd. v. Warner & Swasey Co.*, 638 F.2d 563 (2d Cir.1981). Paragraphs 69 and 70 sufficiently detail numerous alleged misrepresentations and omissions made by defendants that give rise to inferences of primary Rule 10b–5 violations. Defendants assert, however, that plaintiffs failed to allege the critical component of an intent to deceive as required by *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

■ To the contrary, paragraph 88 of the Consolidated Complaint alleges that the Broker Parties "intended to deceive ... or acted with reckless disregard...." Rule 9(b) permits knowledge and intent to be averred generally. *See Ross v. A.H. Robins Co. Inc.*, 607 F.2d 545 (2d Cir.1979). This liberal pleading requirement combined with the factual allegations of misrepresentations and omissions alleged in paragraphs 69 and 70 give rise to an inference that defendants had knowledge of the facts or recklessly disregarded their existence. *See id.* at 558; *IIT v. Cornfeld*, 619 F.2d 909 (2d Cir.1980). The complaint thus offers defendants adequate information to frame a response. *Ross*, 607 F.2d at 558.

### 2. *Aiding and Abetting Liability*

■ The requirements for establishing aiding and abetting liability in this Circuit are well settled. Plaintiff must prove (1) a securities law violation by the primary wrongdoer; (2) knowledge of the purported violation on the part of the aider and abettor; and (3) conduct by the aider and abettor constituting substantial assistance in achieving the primary wrongdoer's fraud. *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983).

The Banking Parties, Northwestern, and Peat Marwick have moved to dismiss Investors' first cause of action which asserts that those defendants violated section 10(b) by aiding and abetting the primary fraud of the GRI and Broker Parties. Pointing out that the complaint alleges merely that they acted recklessly, the Banking Parties first assert that the complaint is defective because it does not allege they acted with the requisite scienter. The banks argue that by reason of their nonfiduciary relationship to plaintiffs and what they term the "routine services" rendered plaintiffs, the Investors must allege, not recklessness, but that defendants *intended* to violate the securities laws. *See, e.g., Armstrong*, 699 F.2d at 91 (where there is no fiduciary duty, the assistance rendered must be knowing and substantial).

■ However, the banks have failed to acknowledge the significance of the fact that in addition to pleading recklessness,[1] the Investors also alleged in Paragraph 90 of the Consolidated Complaint that defendants "knew or should have known" of the fraud alleged. *See also* Consolidated Complaint ¶ 78. Combined with Investors' allegations of misrepresentations and omissions by the GRI and Broker Parties, this allegation of "knowledge" is sufficient as a matter of pleading to survive this motion to dismiss. *See Chemical Bank v. Arthur Andersen & Co.*, 552 F.Supp. 439 (S.D.N.Y. 1982), *rev'd on other grounds*, 726 F.2d 930 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *IIT*, 619 F.2d at 923–24. Furthermore, the additional clause "should have known" does not change this result as the phrase is used only in the disjunctive. *IIT*, 619 F.2d at 924. Finally, in response to defendants' contentions that plaintiffs have failed to support their allegation of knowledge with any factual basis, the Court finds that one might reasonably infer knowledge and intent from the allegations of substantial assistance, constituting circumstantial evi-

---

1. We note in this connection that with regard to the scienter requirement as applied to the aiding and abetting claims, the Allen Investors stated at oral argument, Transcript of Oral Argument, Oct. 23, 1986 ("*Tr.*") at 61, that they believed that Fifth Circuit law applied, and that under that law, recklessness is sufficient to establish scienter under the facts of this case. Given the Court's disposition of this issue in favor of the Investors based on the more stringent "intent" standard, we need not reach the question of Fifth Circuit law at this juncture.

dence and considered in combination, contained in several paragraphs of the Consolidated Complaint. Such allegations include, among others, participation in atypical financing transactions and the sale, at a discount, of promissory notes among defendants. *See Ross,* 607 F.2d at 558; *Woods v. Barnett Bank of Fort Lauderdale,* 765 F.2d 1004, 1010 (11th Cir.1985); *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 96–97 (5th Cir.1975).

The Court further finds that the Consolidated Complaint properly pleads substantial assistance, because it alleges acts of the aider and abettors that could have proximately caused the harm on which the primary liability is predicated. *Bloor,* 754 F.2d at 62. Without reaching the question whether those allegations consisting of inaction would be sufficient in and of themselves to find substantial assistance, the Court concludes that the Investors have alleged active wrongdoing by these defendants satisfying the substantial assistance requirement. These include, *inter alia,* allegations that the defendants reviewed and approved the first PPM, devised the marketing and financing scheme for GRI, and engaged in atypical financing transactions. Consolidated Complaint ¶ 79; *see, e.g., Woodward,* 522 F.2d at 97 (discussing relationship between atypicality and knowledge). These allegations are issues of fact that cannot be determined on a motion to dismiss prior to discovery. *See Armstrong,* 699 F.2d 79; *see also, e.g., Tucker v. Janota* [1979] Fed.Sec.L.Rep. (CCH)

¶ 96,701, at 94,711 (N.D.Ill.1978) (bank's participation based on standing loan arrangements and knowledge of primary wrongdoer's misrepresentation adequate for aiding and abetting liability).

For the foregoing reasons, the Court finds that the Investors have stated a claim sufficiently under section 10(b) and denies the motion to dismiss made by those defendants referred to in paragraph 79 of the Consolidated Complaint.[2]

We reach a different conclusion with respect to the motion made by Peat Marwick to dismiss the claims filed against it by the Abish Investors, the only plaintiffs naming Peat Marwick as a defendant. The Abish Investors do not allege in the Consolidated Complaint that Peat Marwick was in any way associated with the only disclosure document specifically referred to in the Consolidated Complaint, GRI's private placement memorandum dated April 12, 1984—a date apparently preceding the commencement of Peat Marwick's relationship with GRI by several months. Furthermore, the Investors do not allege that Peat Marwick conducted an audit of GRI, rendered an opinion on any GRI financial statements, or made any affirmative representations to Investors. Rather the Consolidated Complaint alleges that Peat Marwick, in addition to having knowledge of the fraud, substantially assisted in its implementation through six specified omissions and inactions.[3]

---

**2.** Included among those parties is Northwestern National Insurance Company whose motion to dismiss was filed after the proper period specified by this Court. With respect to this defendant, the Court finds that in addition to the acts alleged in paragraph 79, substantial acts such as "bonding the promissory notes provided by investors ..." and "assisting in the preparation of marketing materials for GRI" are stated in paragraph 80 of the Consolidated Complaint.

**3.** These inactions include:
(i) sanctioning or permitting the use of the "Jordan Program Checks" which contained misleading data on production and income from gas plants;
(ii) sanctioning or permitting GRI to represent that the merits of its gas liquification program had been thoroughly investigated

and approved by it when in fact no due diligence had been exercised;
(iii) placing the badge of approval of this reputable organization on this fraudulent scheme;
(iv) failing to insure that the securities sold by GRI were registered with the Securities Exchange Commission and the securities' commissions of the states where the securities were sold;
(v) failing to disclose to Investors that misstatements they had discovered, or, with reasonable care, should have discovered in the previous financial and other information or statements on which it knew or should have known Investors' relied;
(vi) failing to disclose to GRI's counsel the violations of law and duty alleged herein. Consolidated Complaint ¶ 86.

"Inaction on the part of the alleged aider and abettor ordinarily should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act." *Armstrong*, 699 F.2d at 91; *accord Woodward*, 522 F.2d at 97. Absent a duty to speak, aider and abettor liability premised on inaction can be imposed only when "there is clear evidence of the required degree of *scienter* ... and a conscious and specific motivation for not acting on the part of an entity with a direct involvement in the transaction." *IIT*, 619 F.2d at 927. The Abish Investors apparently recognize that their allegations of Peat Marwick's "knowledge" fail to meet this strict scienter requirement. These parties focus instead on their contention that even though Peat Marwick made no actual representation to Investors, Peat Marwick still had an affirmative duty to them to act.

However, a clear line of cases, the most widely cited of which is *Gold v. DCL, Inc.*, 399 F.Supp. 1123 (S.D.N.Y.1973), holds that an accounting firm has no duty to disclose fraudulent misconduct and may not be adjudged as an aider and abettor under Section 10(b) where it has not given some representation or certification, such as an opinion or certified statement, or has not invited the public to rely on the firm's financial judgment at the time. *See, e.g., id.* at 1127–28; *Barker v. Lee County Bank*, [1985–86] Fed.Sec.L.Rep. (CCH) ¶ 92,404 (N.D.Ill.1985) [Available on WESTLAW, DCT database], *aff'd sub nom., Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490 (7th Cir.1986); *In re AM International, Inc. Securities Litigation*, 606 F.Supp. 600, 606–07 (S.D.N.Y. 1985); *Royal Anchor, Inc. v. Tetra Finance (HK) Ltd.*, [1985–86] Fed.Sec.L.Rep. (CCH) ¶ 92,432, at 92,647 (S.D.N.Y.1986) [Available on WESTLAW, DCT database]; *Grimm v. Whitney-Fidalgo Seafoods, Inc.*, [1977–78] Fed.Sec.L.Rep. (CCH) ¶ 96,029, at 91,610 (S.D.N.Y.1973); *Fischer v. Kletz*, 266 F.Supp. 180 (S.D.N.Y.1967); *Wessel v. Buhler*, 437 F.2d 279 (9th Cir.1971); *Mendelsohn v. Capital Underwriters, Inc.*, 490 F.Supp. 1069 (N.D.Cal.1979); *see also IIT*,

619 F.2d at 927 (accountant had no independent duty to correct portions of prospectus other than financial statement it prepared); *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987) (finding accountant's duty of disclosure where accountant had prepared financial statements for prospectus).

■ Some of these cases establish the principle that even if an audit is performed, where the accountant has not issued an opinion on financial statements, there is no special relationship with investors which imposes a duty of disclosure on the accountant. *See, e.g., Gold*, 399 F.Supp. at 1127; *In re AM International, Inc. Securities Litigation*, 606 F.Supp. at 606–07. In this case, where Peat Marwick did not even perform an audit and took no part in the preparation of the prospectus specified in the Consolidated Complaint, we fail to discern a duty of disclosure running to the Abish Investors. *See, e.g., Barker*, [1985–86] Fed.Sec.L.Rep. at 92,485–86 (auditor neither prepared, signed, audited or certified prospectus).

This opinion is not altered by the Abish Investors' most recent assertion in the Consolidated Complaint's amended RICO count of "predicate acts" by Peat Marwick. These allegations which bear on the securities claims—including a claim that Peat Marwick mailed two engagement letters to GRI and "planned to and did offer and/or provide" GRI with management consulting and auditing services—are too neutral and attenuated from the primary wrongs alleged to give rise to an inference of proximate causation and substantial assistance.

Furthermore, we are not swayed by the Abish Investors' new allegation that Peat Marwick violated SEC Regulation S–X and thereby aided a fraud by preparing a compilation report without setting forth an opinion. The Abish Investors appear to misconstrue the difference between a compilation report, for which an opinion is not required and which appears to be not even covered by this regulation, and the statements accompanying Registration Statements contemplated by Regulation S–X.

*Compare* 17 C.F.R. § 210.1–.02(a), (d) *with* AICPA Statement on Standards for Accounting and Review Services ("SSARS") No. 1, Compilation and Review of Financial Statements, 2 AICPA Professional Standards (CCH) AR § 100.01, 100.12, 100.14 (December 1978).

Our finding that Peat Marwick had no duty to the Abish Investors absent an affirmative representation is dispositive and mandates dismissal of other claims against Peat Marwick, including the Investors' claim under section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (1982). *See, e.g., Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 944–45 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984) ("the standard for connection imposed by § 17(a) of the 1933 Act is at least as high as that of § 10(b)...."); *Lanza,* 479 F.2d at 1280 n. 2; *Eriksson v. Galvin,* 484 F.Supp. 1108, 1127 (S.D.N.Y. 1980) (essential elements are same for section 10(b) and 17(a) claims). Similarly, we must dismiss Investors' claim of common law fraud against Peat Marwick, *see, e.g., Rush v. Oppenheimer & Co., Inc.,* 592 F.Supp. 1108, 1112 (S.D.N.Y.1984) (common law nondisclosure is actionable provided there was fiduciary relationship or duty of disclosure arising from relationship of trust and confidence); *Moser v. Spizzirro,* 31 A.D.2d 537, 295 N.Y.S.2d 188, 188–89 (2d Dept.1968), *aff'd mem.,* 25 N.Y.2d 941, 305 N.Y.S.2d 153, 252 N.E.2d 632 (1969), as well as the claim of breach of duty of care. *See Ultramares Corp. v. Touche,* 255 N.Y. 170, 189, 174 N.E. 441, 448 (1931); *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 551, 493 N.Y.S.2d 435, 443, 483 N.E.2d 110, 118 (1985) (conduct required on part of accountant linking them to parties which shows that accountant understood that parties relied). Accordingly, Peat Marwick's motion to dismiss as to those claims is granted. Furthermore, since plaintiffs have been provided ample opportunity to amend their complaint and have asserted a willingness to have the Consolidated Complaint deemed a definitive statement of their claims, *see* Tr. at 23–28, we deny plaintiffs' request to replead the claims against Peat Marwick.

## C. *Section 17*

Defendants have moved to dismiss the Investors' claim under section 17(a) of the 1933 Act, 15 U.S.C. § 77q (1982), on the ground that no private cause of action exists thereunder. The motion is granted in part and denied in part.

The Second Circuit recognized a private cause of action under section 17 in *Kirshner v. United States,* 603 F.2d 234, 241 (2d Cir.1978), *cert. denied,* 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979), finding that there was "little practical point" in distinguishing between section 10(b) and section 17 for purposes of inferring a private right. The Second Circuit has since indicated that this holding "may be open to reexamination" in light of subsequent Supreme Court decisions and the legislative history of section 17. *See Yoder v. Orthomolecular Nutrition Institute, Inc.,* 751 F.2d 555, 559 n. 3 (2d Cir.1985); *see also Zerman v. Ball,* 735 F.2d 15, 23 (2d Cir. 1984) (declining to reach the issue); *Manufacturers Hanover Trust Co. v. Drysdale Securities Corp.,* 801 F.2d 13 (2d Cir.1986) (same).

Upon conducting this reexamination, some of the lower courts in this district have ruled that the *Kirshner* holding is no longer valid and that no private cause of action exists under section 17. *See, e.g., Ackerman v. Clinical Data, Inc.,* [1985–86] Fed.Sec.L.Rep. (CCH) ¶ 92,207 (S.D.N.Y.1985) [Available on WESTLAW, DCT database]; *Kaufman v. Amtax Planning Corp.,* slip op., 85 Civ. 4520 (S.D.N.Y. June 30, 1986). While Rule 10b–5 and section 17 offer plaintiffs the same relief, *Yoder,* 751 F.2d at 559 n. 3, these courts have concluded that sections 10(b) and 17 can be meaningfully distinguished. *See, e.g., Aaron v. Securities and Exchange Commission,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) (unlike section 10(b), scienter not necessary element under section 17(a)(2) and (a)(3)).

██ This Court, however, is inclined to agree with the court in *Krome v. Merrill Lynch & Co., Inc.,* 637 F.Supp. 910, 916–17

n. 3 (S.D.N.Y.), *vacated in part on other grounds,* 110 F.R.D. 693 (S.D.N.Y.1986), that *Kirshner* is now the controlling law in the Second Circuit. For the purposes of this present multidistrict lawsuit, "[t]his court will adhere to the law of this Circuit [and thereby find a private cause of action under section 17] until it is determined by the court of appeals to be otherwise." *Id.* Until that time, our finding that Investors have stated the elements of a claim under section 10(b) requires that their claims under section 17 similarly be upheld. *See Lanza v. Drexel & Co.,* 479 F.2d 1277, 1280 n. 2 (2d Cir.1973); *Aaron,* 446 U.S. at 691, 697, 100 S.Ct. at 1952, 1956.

We have addressed ourselves thus far to the section 17 claims by those plaintiffs filing suit within the Second Circuit, and for the reasons stated above, deny their motions to dismiss the claims under that section. However, the law of the Fifth Circuit squarely holds that no private right of action is available under section 17 to purchasers of securities. *See, e.g., Simpson v. Southeastern Investment Trust,* 697 F.2d 1257, 1258 (5th Cir.1983); *Landry v. All American Assurance Co.,* 688 F.2d 381, 387–391 (5th Cir.1982). As a result, Investors agree with defendants that the section 17 claims of investors residing in Texas (the Allen Investors, Ditto Investors, Clarke Investors, Allibone Investors, Parks and Johnson) should be dismissed. The Court therefore holds that the section 17 claims of the Texas Investors fail to state a claim upon which relief can be granted.

### D. *Section 12*

#### 1. *Statute of Limitations*

Defendants contend that the Investors' claims under section 12(1) and 12(2) of the 1933 Act, 15 U.S.C. §§ 77*l*(1), 77*l*(2) (1982), should be dismissed pursuant to section 13 of the Act, 15 U.S.C. § 77m (1982), for failure to comply with the statute of limitations. Specifically, Peat Marwick argues that the section 12(1) claims should be dismissed because Investors did not file suit "within one year after the violation...." 15 U.S.C. § 77m. They urge dismissal of the section 12(2) claims on the grounds that

Investors did not bring suit "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made...." 15 U.S.C. § 77m.

With respect to section 12(1), Peat Marwick contends that the alleged violations—the failure to register and the failure to deliver a prospectus—occurred at the time plaintiffs purchased the Units. All purchases occurred between April and November 1984. Therefore, under Peat Marwick's analysis, the statute of limitations would have barred all suits filed subsequent to a year thereafter.

 We agree with Investors, however, that the allegations of the Consolidated Complaint are sufficient to toll the statute of limitations by virtue of the alleged fraudulent concealment of the need to register the reclamation units with the SEC. "Federal law has long been established that where a federally related cause of action has been fraudulently concealed, or where the cause of action is itself to recover for fraud, a federally established period of limitations does not begin to run until discovery." *Dyer v. Eastern Trust & Banking Co.,* 336 F.Supp. 890, 901 (D.Me. 1971); *Katz v. Amos Treat & Co.,* 411 F.2d 1046 (2d Cir.1969). "The rule depends upon a clear allegation of fraudulent concealment, conscious deception or bad faith on the part of the defendants." *Competitive Associates, Inc. v. Fantastic Fudge, Inc.,* 58 F.R.D. 121, 123 (S.D.N.Y.1973).

The complaint in this case alleges that misrepresentations were made knowingly by the Broker Parties to the Investors by way of the private placement manual and orally to the effect that the offering of Units did not require registration with the Securities and Exchange Commission. The complaint also alleges that the Banking Parties, Northwestern, and Peat Marwick failed to insure that the securities sold by GRI were registered. Moreover, the complaint states that these defendants either participated directly in the sale of such unregistered securities or substantially assisted and/or conspired in such sales. The complaint does not state when plaintiffs

discovered defendants' alleged wrongdoing. However, the complaint does plead compliance with the one year statute of limitations.

We agree with the court in *In re Energy Systems Equipment Leasing Securities Litigation (No. MDL–637)*, 642 F.Supp. 718, 745 (E.D.N.Y.1986), which excused plaintiffs' failure to plead the date that the fraud was discovered and found on facts similar to this case that a complaint under section 12(1) was properly pled for purposes of a ·motion to dismiss. *See also Competitive Associates, Inc.*, 58 F.R.D. at 124 (motion to dismiss denied on statute of limitations grounds and discovery allowed where there were questions of fact regarding existence of a fraudulent scheme and time of reasonable discovery of section 12(1) violation; *see also Houlihan v. Anderson-Stokes, Inc.*, 434 F.Supp. 1319 (D.D.C.1977). *But see, e.g., Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 552–53 & n. 26 (S.D.N.Y.1977) (averments as to time fraud discovered required). Therefore, the Court finds plaintiffs' allegations with respect to their 12(1) claims sufficient to withstand defendants' motions to dismiss on statute of limitations grounds.

Although we view it as a close question, we similarly find that plaintiffs' claims under section 12(2) pass muster, at least for purposes of a motion to dismiss. Peat Marwick cites cases to the effect that a pleading under section 12(2) must set forth details as to plaintiffs' discovery of the fraud alleged and as to their exercise of reasonable diligence in seeking out evidence of such fraud. *See, e.g., Krome v. Merrill Lynch & Co.*, 637 F.Supp. 910, 914–15 (S.D.N.Y.), *vacated in part on other grounds*, 110 F.R.D. 693 (S.D.N.Y.1986). However, we are persuaded that plaintiffs' allegations that defendants concealed the fraud, specifically by misrepresenting that the investments need not be registered with the SEC, as set forth in our discussion above in connection with section 12(1), excuses plaintiffs from detailed allegations of fact at this stage of the litigation. The question whether the statute of limitations has run raises an issue of fact, *see, e.g., Krome*, 637 F.Supp. at 914, and defendants are not precluded from moving for summary judgment on the issue when the facts are well in hand. In the meantime, defendants' motions to dismiss the section 12(2) claims on the grounds that they are time barred are denied.

### 2. *Definition of "Seller"*

In their second and third causes of action alleging violations of sections 12(1) and 12(2) of the '33 Act, the Investors charge that the defendants "substantially participated in the offer and sale of [the] securities ... and/or conspired with the GRI Parties and Broker Parties to make such offers and sales of securities." By its express language, section 12 applies only to sellers or offerors of securities and declares that they may be liable "to the person purchasing such security from [them]." 15 U.S.C. § 77*l* (1). Defendant banks, Northwestern, and Peat Marwick argue that Investors' section 12 claims must be dismissed since Investors do not allege that these defendants actually sold the Units to Investors. We find that while the banks and Northwestern qualify as "sellers" for purposes of section 12, the same is not true for Peat Marwick, and the section 12 claims must be dismissed as against it alone.

Despite the narrow language of the section, strict privity with the buyer is not a prerequisite to liability under section 12. *Somerville v. Major Exploration, Inc.*, 576 F.Supp. 902, 913 (S.D.N.Y.1983); *see Katz v. Amos Treat & Co.*, 411 F.2d 1046 (2d Cir.1969); *Croy v. Campbell*, 624 F.2d 709, 713 (5th Cir.1980). Conversely, a *de minimis* involvement in a securities offering is insufficient to sustain a section 12 claim. *Katz v. David W. Katz & Co.*, [1983–1984] Fed.Sec.L.Rep. (CCH) ¶ 99,669, at 97,687 (S.D.N.Y.1984) [Available on WESTLAW, DCT database]. What is required is that a section 12 plaintiff plead and prove that the defendant in question proximately caused the sale and injury, *see, e.g., Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680 (5th Cir.1971), or "substantially participated" in the transaction. *See, e.g., Klein v. Computer Devices, Inc.*, 591 F.Supp.

270, 276 (S.D.N.Y.1984), *modified on re-hearing*, 602 F.Supp. 837 (S.D.N.Y.1985). "Participation can include active participation in the transaction, or aiding and abetting, or conspiring with the seller." *Klein*, 591 F.Supp. at 276; *see also, e.g., Somerville*, 576 F.Supp. at 913 (defendant must be seller's agent, controlling person of the seller, or active participant in the sale); *cf. Hill York Corp.*, 448 F.2d at 693 (defendants who were "motivating force" behind project held liable under section 12); *Croy*, 624 F.2d at 713 n. 5 (rejecting liability under aiding and abetting and controlling person standard in favor of causation test). While scienter is required for aiding and abetting liability under section 12, its necessity in the context of section 12 primary liability is, at most, uncertain. *See Hokama v. E.F. Hutton & Co., Inc.*, 566 F.Supp. 636, 641–42 (D.Cal.1983); *Lanza v. Drexel*, 479 F.2d 1277, 1299 (2d Cir.1973) (dictum) (scienter required).

▆ The Consolidated Complaint in this case adequately pleads both primary and aiding and abetting liability under section 12 against the Banking Parties and Northwestern. Our finding that a claim is stated for aiding and abetting liability under section 10(b) is conclusive as to the adequacy of the aiding and abetting claim under section 12. *See, e.g., Frankel v. Wyllie & Thornhill, Inc.*, 537 F.Supp. 730, 744 (W.D. Va.1982). With respect to primary liability, Investors' complaint adequately sets forth allegations of meaningful participation and conspiracy by these defendants for purposes of a motion to dismiss. Although the complaint does not allege that defendant banks were in actual contact with plaintiffs at the time of sale, it does allege that the banks reviewed and approved the first private placement manual containing numerous misrepresentations, continued to finance GRI after learning that certain investors had defaulted based on claims of fraud, and purchased and sold Investors' notes at a discount. It alleges that Northwestern, *inter alia*, assisted in the preparation of marketing materials for GRI and bonded the promissory notes provided by investors. At this stage of the litigation, Investors are entitled to have these allega-

tions accepted as true. *Klein*, 591 F.Supp. at 276. Thus, regardless of whether, as the banks claim, the evidence will ultimately demonstrate that they merely innocently loaned money to investors in the ordinary course of their business—arguably an insufficient basis for imposing section 12 liability—at this time, the Court must assume that the Investors' allegations of more significant and actual participation in the securities violations are valid.

▆ However, such averments of active and meaningful participation in the sale are absent from the Consolidated Complaint as it applies to Peat Marwick. As discussed in connection with section 10(b), the complaint fails to allege any significant affirmative acts or representations by Peat Marwick made concurrently with the sale of Units to Investors, or the existence of any misleading documents attributable to Peat Marwick that could serve as the predicate for concluding that Peat Marwick was the proximate cause or substantially participated or assisted in the sale. *See, e.g., Kilmartin v. H.C. Wainwright & Co.*, 580 F.Supp. 604, 608 (D.Mass.1984) (substantial assistance is element of section 12 aiding and abetting claim); *Mendelsohn v. Capital Underwriters, Inc.*, 490 F.Supp. 1069, 1087 (N.D.Cal.1979) (accounting firm held not to be "seller" on similar facts); *Grimm v. Whitney-Fidalgo Seafoods, Inc.*, [1977–78] Fed.Sec.L.Rep. (CCH) ¶ 96,029 (S.D.N.Y.1973) (accounting firm's alleged participation in section 12 violations insufficient for liability). Therefore, Peat Marwick's motion to dismiss the section 12 claims against it is granted.

### E. *Section 15*

The Broker Parties allege that Investors' fourth cause of action charging that the Brokers violated section 15(c)(1) of the Securities Exchange Act, 15 U.S.C. § 78*o* (c)(1) (1982), should be dismissed because no private right of action exists under that section.

▆ Quite to the contrary, the Second Circuit unequivocally has held that a private right of action exists under section

15(c)(1). *Opper v. Hancock Securities Corp.*, 367 F.2d 157 (2d Cir.1966); *see also Franklin National Bank v. L.B. Meadows & Co.*, 318 F.Supp. 1339 (E.D.N.Y.1970). This Court is bound by that law insofar as it applies to Investors who filed claims within this Circuit.

With respect to the section 15 claims filed by the Texas Investors, we agree with defendants that the law of the transferror forum applies. *See, e.g., Berry Petroleum Company v. Adams & Peck*, 518 F.2d 402, 408 n. 7 (2d Cir.1975). However, the Fifth Circuit has not considered whether a private right of action exists under section 15(c)(1), and we decline to predict the result should that court be faced with the issue. In the absence of any applicable Fifth Circuit law, we adopt the law of the Second Circuit with respect to the section 15 claims of all investors and find a private right of action. Therefore, defendants' motions to dismiss the fourth cause of action are denied without prejudice to renewal should the Fifth Circuit rule during the pendency of this litigation that there is no private right of action under section 15.

### F. *The Civil RICO Claims*

At the oral argument of these motions, a segment of the plaintiff class, the Abish Investors, were granted leave to replead the RICO allegations contained in the Consolidated Complaint. Subsequently, on November 13, 1986, the Abish Investors filed an Amended Consolidated Complaint (the "Amended Complaint"), which contains as a fifth cause of action renewed RICO allegations against named defendants. Various defendants move to dismiss the reframed RICO allegations pursuant to Rule 12(b)(6). While a number of parties submitted affidavits in connection with the motions, when the Court offered to treat the submissions as summary judgment motions, all but defendant Financial Guaranty declined. Accordingly, in deciding the motions to dismiss, we have not considered matters outside the Amended Complaint and the memoranda of law submitted in connection with the motions. For the reasons we outline below, all of the motions to dismiss the RICO claims are denied except

for the motion of Peat Marwick as to which decision is reserved.

In Section I, we summarized the factual allegations contained in the Consolidated and Amended Complaints, and it is unnecessary to repeat them here. In deciding the present motions to dismiss the RICO counts, we accept as true all of those allegations and view them in the light most favorable to the RICO plaintiffs. *George C. Frey Ready-Mixed Concrete, Inc., v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 553 (2d Cir.1977).

The RICO defendants attack the sufficiency under F.R.Civ.P. 12(b)(6) of the Abish Investors' claims. In this regard, the defendants argue that as a matter of law, RICO's definitional provisions do not encompass the claims alleged here. In particular, the RICO defendants contend, *inter alia*, that the Amended Complaint (i) fails to plead the substantive predicate acts of racketeering activity, (ii) fails to allege the existence of a "pattern" of racketeering activity, and (iii) fails to plead the existence of a RICO "enterprise."

RICO is a powerful federal statute and Congress has directed the courts to construe it expansively. The statute contains the mandate that RICO's provisions are to "be liberally construed to effectuate [RICO's] remedial purposes." Pub.L. 91–452, § 904(a), 84 Stat. 947. The Supreme Court echoed Congress' direction in *Sedima, S.P.L.R. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), which reversed the Second Circuit's requirement that civil RICO plaintiffs demonstrate a distinct "racketeering injury" to sustain a RICO claim. Broad construction of RICO's civil provisions, the Supreme Court observed, "is the lesson not only of Congress' self consciously expansive language and overall approach ... but also of its express admonition." *Sedima*, 105 S.Ct. at 3286. We heed this lesson in deciding the motions before us.

To state a civil claim for damages under RICO, a plaintiff must at the outset allege that the defendant has violated one of the substantive provisions of the RICO statute, commonly known as "criminal

RICO." 18 U.S.C. § 1962 (1976); *see Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied sub nom.*, *Moss v. Newman*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). By grounding his claim in one or more of the substantive subsections of section 1962, the RICO plaintiff declares the theory of the violation for which he seeks redress.

While the Amended Complaint does not specifically identify the subsections of section 1962 on which the RICO cause of action is based, *see* Amended Complaint ¶ 122, it appears from the legal memoranda that the Abish Investors claim that the defendants violated section 1962(a) and section 1962(c) of the statute. *See* Investors' Memorandum of Law in Opposition to Certain Motions To Dismiss the Consolidated Complaint at 29–34. In our view, section 1962(c) is the substantive RICO provision that appears to be applicable to the factual framework which the Abish Investors depict in the Amended Complaint.

Section 1962(c) provides in pertinent part:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

By alleging a violation of section 1962(c), a plaintiff alleges that he has sustained an economic injury by virtue of the predicate acts the defendants are alleged to have committed. *Sedima*, 105 S.Ct. at 3286.

The theory of a section 1962(a) violation is different. Section 1962(a) provides in part:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Violation of this subsection consists of using or investing the proceeds of a pattern of racketeering activity. One who has sustained injury as a result of the investment of the proceeds may sue for a violation of section 1962(a). By contrast, it cannot be said that one who has suffered injury by reason of the predicate acts of racketeering has thereby been injured by the investment of the proceeds.

■■■■ Because the real nature of the Abish Investors' RICO claim appears to flow from the allegation that the predicate acts induced them "to invest in [the] Units," Amended Complaint ¶ 110C(vi), we believe that section 1962(c), not section 1962(a), is the applicable statutory provision. We do not believe the Abish Investors could show, as they must, that they were injured in their business or property by reason of violations of section 1962(a). 18 U.S.C. § 1964(c) (1976). *Morgan Stanley*, 719 F.2d at 17. Accordingly, to the extent the Amended Complaint purports to state a violation of section 1962(a), it is dismissed.

■■■■ To sustain RICO's pleading burdens under section 1962(c), a plaintiff must sufficiently allege "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly ... participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Morgan Stanley*, 719 F.2d at 17 (2d Cir.1983). In addition, the RICO plaintiffs must show that they were injured in their business or property by reason of the violations of section 1962(c). As we have noted, an examination of the memoranda submitted in support of the motions to dismiss reveals that the defendants believe the Amended Complaint fails

to meet virtually all of these pleading requirements.[4]

## 1. Predicate Acts of "Racketeering Activity"

For analytical coherence, it is useful to begin our analysis of the RICO counts with an appraisal of the RICO defendants' assertions that the Abish Investors have not pleaded facts which state a claim that the defendants have committed predicate acts of "racketeering activity." *See, e.g.,* Reply Memorandum of Defendants Intercontinental Monetary Corporation, Edgar R. Eisner, Laurance H. Friedman and Richard Kelly in Support of Motion to Dismiss Plaintiffs' Consolidated Complaint and for Sanctions or for Security for Costs at 38. Through this argument, the defendants attack the sufficiency of the Amended Complaint as it relates to the fourth of the elements of a RICO violation the Second Circuit delineated in *Morgan Stanley. Id.*

The predicate acts of "racketeering activity" enumerated in the statute are quite broad; they include "nine state law felonies and the violation of more than 25 federal statutes." *Bankers Trust Company v. Feldesman,* 648 F.Supp. 17, 34 (S.D. N.Y.1986). To be viable, a RICO complaint must allege facts which would, if proved, constitute acts indictable under the listed statutes. In this sense, RICO is derivative.

In the preceding sections of this Opinion, we addressed the legal sufficiency of the underlying securities fraud allegations with respect to each defendant against whom such allegations have been made. We concluded that all of these claims except for those asserted against Peat Marwick were properly pleaded and could not be dismissed as a matter of law. Allegations which are sufficient to sustain a claim of securities fraud may also ground a claim of "racketeering activity." With respect to Peat Marwick, there are, as we discuss *infra,* sufficient allegations of mail and wire fraud to sustain the RICO counts pleaded in the Amended Complaint. Accordingly, we find that the Amended Complaint adequately pleads facts which, if proved, would support the conclusion that the RICO defendants engaged in predicate acts of racketeering activity through violations of the federal securities laws.

██ The RICO plaintiffs allege that certain of the defendants carried out the securities fraud through a series of separately indictable acts of federal mail and wire fraud. RICO's definition of "racketeering activity" includes mail and wire fraud. 18 U.S.C. § 1961(1). The elements of an indictable offense under the federal mail and wire fraud statutes are "(1) the existence of a scheme to defraud, and (2) the use of the mails or interstate wires in furtherance of the fraudulent scheme." *Tryco Trucking Co. v. Belk Stores Services,* 634 F.Supp. 1327, 1333 (W.D.N.C.1986). A scheme to defraud is a plan whose object is "to deprive one of property through fraudulent or deceptive means, such as material misrepresentation [or] concealment...." *Id.*

██ The factual allegations set forth in the Amended Complaint, assumed true for the purposes of these motions, adequately allege a scheme to defraud. The Abish Investors frame a picture of falsely positive factual representations about the merits and track record of the gas reclamation program, which when communicated in the context of a packaged investment offering complete with ready financing, induced them to invest. Those defendants who allegedly used the mails and wires are alleged to have known of the false representations, or to have recklessly disregarded those representations, and in furtherance of the underlying scheme to defraud, facilitated its execution.

The mail and wire fraud allegations build on the securities fraud claims pursued by all investors. The Amended Complaint alleges, *inter alia,* that from August through November 1984, the Broker Parties, through the mails and wires, falsely represented that "Privatbanken, Northwestern, and Peat Marwick thoroughly examined and approved of the merits of the

---

**4.** There does not appear to be a dispute that the Amended Complaint adequately pleads that the enterprise's activities affected interstate commerce—the seventh *Morgan Stanley* element.

GRI offering" and that certain checks (the "Jordan Program Checks") representing payments for the successful production of gas from Units owned by "GRI control persons" had already been paid to the owners of those Units. Amended Complaint ¶ 110C(v). The Abish plaintiffs also claim that from April through November 1984, defendants Northwestern, Esrine, Bianco, the Banking Parties, and Intercontinental used the interstate mails "to transmit and receive, *inter alia,* at least twenty applications for indemnity bonds," which were accepted with knowledge of or reckless indifference to the use of the bonds to "falsely indicate that the securities offering by GRI was not required to be registered with the Securities and Exchange Commission," Amended Complaint ¶ 110C(iv). It is also alleged that between April and December 1984, defendants Roseneath, Storms, Lewis, Bradbury, Makris, Jordan and Butler used the mails to distribute private placement memoranda which they knew or should have known contained numerous false statements, Amended Complaint ¶¶ 110C(vi), 69, 70. In addition, the RICO plaintiffs claim that between August 1, 1984 and January 22, 1985, defendant Peat Marwick, acting "at a time when it knew or acted with reckless indifference to the fact that there had been issued in the summer of 1984 and/or that the Broker Parties and/or their employees ... were distributing to the Abish Investors from August through November of 1984, Jordan Program Checks" which allegedly were used to represent to the Abish Investors that certain GRI control persons had already received distributions by virtue of gas produced by Units they owned, used the interstate mails and wires to communicate with GRI with regard to certain engagement letters which purportedly set forth Peat Marwick's role as a management consultant and auditor in the GRI offering. *See* Amended Complaint ¶ 110C(i), (ii), (iii).

▮ Each separate use of the interstate mails or wires in furtherance of a scheme to defraud constitutes a separate crime under the mail and wire fraud statutes. *See United States v. Blankenship,* 746 F.2d 233 (5th Cir.1984), *rehearing denied* (en banc), 750 F.2d 69 (5th Cir.1984) (mail fraud); *United States v. Hewes,* 729 F.2d 1302 (11th Cir.1984), *rehearing denied* (en banc), 734 F.2d 1481 (11th Cir.1984), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985) (wire fraud).

▮ Examined through the prism of these legal standards, the factual allegations recited above, if true, could form the basis of indictable offenses under the federal mail and wire fraud statutes against each of the defendants named. We note, with respect to defendant Peat Marwick, that dismissal of the securities fraud claims asserted against it leaves only the allegations of multiple acts of mail and wire fraud as the predicate RICO acts. Although it is a close question, the allegations framed in the complaint, assumed true, are sufficient to withstand a motion to dismiss. If, for example, the Abish Investors were to prove that Peat Marwick, with knowledge of the scheme to defraud, mailed engagement letters that furthered the plan, such mailings would constitute mail fraud. It is not necessary that the mailing contain fraudulent statements; rather, it suffices legally if the transmissions advance the execution of the scheme. *See, e.g., United States v. Vardell,* 760 F.2d 189, 190–91 (8th Cir.1985). That Peat Marwick owed no duty to the investors is not controlling on the mail and wire fraud counts. *Compare Royal Anchor, Inc. v. Tetra Finance (HK) Ltd.,* [1985–86] Fed.Sec.L.Rep. (CCH) ¶ 92,432 (S.D.N.Y.1986) [Available on WESTLAW, DCT database] (court dismisses RICO counts, based on predicate securities law violations, asserted against accounting firm where the firm had no duty to investors and where circumstances surrounding submission of multiple pleadings suggested plaintiffs were manipulating dates in the latest complaint to avoid impact of prior dismissal). Accordingly, we conclude that the predicate acts of mail and wire fraud have been sufficiently alleged to withstand a motion to dismiss on the ground that the Amended Complaint fails to plead adequately "racketeering activity"—the fourth element of a RICO violation as outlined in

*Morgan Stanley.* However, with respect to Peat Marwick, as we discuss *infra*, we have serious doubts as to whether the Abish Investors have sufficiently alleged that their injuries were sustained by reason of the purported mail and wire fraud. *See* discussion, *infra* at Section II.F.4.

### 2. *The "Pattern" Requirement*

To constitute violations of RICO, a defendant's predicate acts of "racketeering activity" must constitute a "pattern." The statutory definition of a "pattern" of racketeering activity states that a "pattern" consists of "at least two acts of racketeering activity" within a ten year period. 18 U.S.C. § 1961(5).

Each of the RICO defendants argues that even if the Court were to conclude that it had engaged in racketeering acts, such acts, taken together, would not constitute a "pattern" of racketeering activity. To support this proposition, the RICO defendants assert that the Amended Complaint describes at most a grand plan with a single purpose—to sell GRI Units to as many investors as possible. In essence, each defendant argues that any act committed in connection with the sale of such Units was part of a single effort to achieve the same goal and, even if repeated, constituted but one single episode of activity. *See, e.g.,* Memorandum of Law in Support of the Motion of Defendants Austin Davenport Associates, Inc., *et al.* at 21–29. Accordingly, defendants argue that their acts do not rise to the level of a "pattern" of racketeering activity.

The principal legal authority on which defendants anchor their arguments is the Supreme Court's dictum in a footnote in *Sedima,* 105 S.Ct. at 3285 n. 14, in which the Court excerpted from the Senate Report on RICO. That Report had emphasized that the presence of "continuity plus relationship" among the predicate acts of racketeering activity "combine[d] to produce a pattern." *Id.* In addition, defendants rely on subsequent case law which hold that a pattern of racketeering activity consists of multiple episodes of criminal activity rather than related acts with a singular purpose. *See, e.g., Soper v. Simmons International, Inc.,* 632 F.Supp. 244 (S.D.N.Y.1986).

The motions to dismiss and the legal memoranda submitted in connection therewith were filed prior to the Second Circuit's recent decision in *United States v. Ianniello,* 808 F.2d 184 (2d Cir.1986). In that case, the Second Circuit announced that the *Sedima* footnotes and the RICO "pattern" definition should not be construed to require the existence of multiple episodes of criminal activity—the definition which defendants urge that we apply here. Under *Ianniello,* "when a person commits at least two acts that have the common purpose of furthering a continuing criminal enterprise with which that person is associated, the elements of relatedness and continuity which the *Sedima* footnote construes section 1962(c) to include are satisfied." *Ianniello,* 808 F.2d at 192.

The *Ianniello* court expressed its approval of the interpretation of the "pattern" requirement set forth in two lower court decisions in civil cases: *Bankers Trust Company,* 648 F.Supp. at 24–27 and *Conan Properties, Inc. v. Mattel, Inc.,* 619 F.Supp. 1167, 1170–71 (S.D.N.Y.1985). In *Bankers Trust,* the more recent of the two cases, Judge Conner concluded that "a pattern of racketeering activity is alleged when a plaintiff claims two or more connected criminal acts listed in § 1961(1)." *Bankers Trust,* 648 F.Supp. at 26. Judge Conner reasoned that the "continuing aspect" of the pattern definition "is satisfied by the existence of a second predicate act," and "the relationship aspect is satisfied by some connection between the acts." *Id.* at 26. Similarly, in *Conan,* 619 F.Supp. 1167, the court concluded that "when two acts which relate to each other and arise out of the same scheme are alleged," a RICO plaintiff has successfully pleaded a "pattern" of racketeering activity. *Id.* at 1170.

The Amended Complaint clearly meets these standards. Multiple predicate acts have been alleged against each of the RICO defendants. That the acts were allegedly part of a single scheme to defraud prospective purchasers demonstrates that

the acts alleged are related and, thus, that the relatedness aspect of the "pattern" definition has been met. Likewise, the fact that the Amended Complaint alleges that certain of the predicate acts were "repeated as to each of the 27 Abish Investors, some of whom purchased more than one Unit on more than one occasion" in the period from August to November 1984 adds to the continuity element of the "pattern" claim. We hold, therefore, that the Amended Complaint adequately pleads a "pattern" of racketeering activity as to each of the RICO defendants. Thus, the second and third elements of a section 1962(c) claim as outlined in *Morgan Stanley* have been satisfied. *Morgan Stanley,* 719 F.2d at 17.

### 3. *Participation in an "Enterprise"*

The remaining questions center on whether the Abish Investors have adequately pleaded facts from which it could be inferred that each of the defendants, through the "pattern of racketeering activity," participated in a RICO "enterprise." In analyzing the issues raised in this context, we revisit the language of the statute. Section 1962(c) provides that "it shall be unlawful for any person ... associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." An enterprise is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

The Amended Complaint pleads the composition of the RICO "enterprise" in the alternative. Paragraph 110 of the Amended Complaint states that:

The defendants, counterclaim and third-party defendants, in conspiracy with one another, constituting an association in fact, have committed two or more willful violations of the federal securities laws, as well as criminal mail fraud and wire fraud, constituting a pattern of racketeering activity and have participated in a racketeering enterprise, the activities of which affect interstate commerce. In the alternative, the defendants, counterclaim and third-party defendants, except GRI, in conspiracy with one another, through GRI, the RICO enterprise, have committed two or more willful violations of the federal securities laws, as well as criminal mail fraud and wire fraud, constituting a pattern of racketeering activity and have participated in a racketeering enterprise, the activities of which affect interstate commerce.

It appears that the alternative formulations are designed to dovetail with the dual allegations regarding the substantive RICO sections which the Abish Investors claim the defendants violated. Because we have concluded that section 1962(c) is the applicable RICO substantive provision, *see* discussion *supra,* we review the first formulation included in the Abish Investors "disjunctive" characterizations of the RICO "enterprise," the formulation which appears to relate most closely to section 1962(c). *See* Investors' Memorandum of Law at 33.

The RICO plaintiffs characterize the "enterprise" involved in this case as an "association in fact" rather than a legally cognizable entity. *See* Amended Complaint ¶ 110. Such a characterization is clearly permissible under section 1961(4) of the statute. An "association in fact" may consist of a "group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). In this case, the Abish Investors allege that the defendants joined together for the purpose of conducting activities directed towards the fraudulent sale of GRI Units. The "enterprise," the Abish Investors claim, "is the alliance of the defendants which consorted for the common purpose of committing the predicate acts." Investors' Memorandum of Law at 31.

Defendants object .to this characterization as insufficient under RICO. For example, defendants Connecticut National Bank, Privatbanken A/S, Ensign Bank FSB and Morris County Savings Bank assert

that "[t]he Abish Investors do not allege that [they] ever directly or indirectly communicated—much less associated—with GRI or any other defendant. At most, the Consolidated Complaint portrays separate and distinct entities whose independent activities in furtherance of their respective business roles just happened to coalesce to damage the Abish Investors."[5] Reply Memorandum of The Connecticut National Bank, Privatbanken A/S, Ensign Bank FSB and Morris County Savings Bank ("Certain Banks' Reply Memorandum") at 18.

■ That the Abish Investors plead the RICO enterprise in terms of the conduct and goals of those allegedly a part of the enterprise is not a bar to the RICO cause of action. As Judge Kaufman observed in *United States v. Bagaric*, 706 F.2d 42, 56 (2d Cir.1983), "it is logical to characterize any associative group in terms of what it does, rather than by abstract analysis of its structure."

The logical connection Judge Kaufman explored in *Bagaric* is the principle that underlies judicial "application of RICO to situations where the enterprise was, in effect, no more than the sum of the predicate racketeering acts." *Bagaric*, 706 F.2d at 55; *see also United States v. Mazzei*, 700 F.2d 85, 89 (2d Cir.1983), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983); *United States v. Errico*, 635 F.2d 152, 156 (2d Cir.1980), *cert. denied*, 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981). In *Mazzei*, a group of Boston College basketball players and bettors joined in an illegal conspiracy to shave points in Boston College basketball games as a way of increasing their gambling profits. The "pattern" of racketeering activity consisted of the "fixing [of] nine B.C. basketball games." *Mazzei*, 700 F.2d at 89. The RICO "enterprise" was merely the group of individuals who had joined for the common purpose of carrying out the predicate acts in order to effectuate the goal of fixing the games. That is, the enterprise

consisted of the bettors and players operating as a "continuing unit, i.e., during the 1978–79 basketball season." *Id.* Despite the fact that the proof offered to establish the existence of the "pattern" of racketeering and the RICO "enterprise" had "coalesced," the Second Circuit upheld *Mazzei*'s RICO conviction. *Mazzei*, 700 F.2d at 88–89.

Similarly, in *United States v. Errico*, 635 F.2d 152, 156 (2d Cir.1980), *cert. denied*, 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981), the Second Circuit held that a circle of jockeys and a circle of gamblers, who associated for the "single illegal purpose" of betting on fixed races during a nine month period constituted a RICO "enterprise." *Id.* at 156. The "community of interest" among the group members and the "continuing core of personnel" were factors that led the court to conclude that an association in fact enterprise existed. *Id.*

More recently, the Second Circuit discussed the definition of a RICO "enterprise" in *Ianniello*. In that case, the Second Circuit held that a section 1962(c) RICO claim requires that the enterprise "be a continuing operation and that the acts be related to the common purpose." *Ianniello*, 808 F.2d at 191. The common purpose, however, may be singular. An enterprise with "a single purpose ... can provide the basis for a section 1962(c) violation." *Id.*

We believe the Abish Investors have adequately pleaded the existence of an "enterprise." The allegation is that a group of persons informally associated over a period of several months to package and sell GRI Units to the public. The Abish Investors assert that each defendant named, with awareness of or with reckless indifference to the scheme to defraud, took action to further that common purpose. Assuming the truth of plaintiffs' allegations, it is clear that the defendants had a "communi-

---

**5.** The principal briefs submitted in connection with the present motions to dismiss were filed prior to the amendment of the Consolidated Complaint. However, in letters to the Court subsequent to the submission of the Amended Complaint, the defendants renew the arguments made in the original briefs. *See* Letter from Rosemary Byrne to the Court (Nov. 26, 1986); *see also* Letter from Nancy Harnett to the Court (Nov. 28, 1986).

ty of interest" and that the association had a "core group of personnel." *Errico*, 635 F.2d at 156. That the association's common purpose can be described as singular does not, as *Ianniello* instructs, vitiate the association's status as a RICO "enterprise."

*Ianniello* holds that a RICO "enterprise" must be a "continuing operation." *Ianniello*, 808 F.2d at 191. Although it is not claimed here, as it was in *Ianniello*, that the fraud would continue indefinitely, the Amended Complaint alleges that the 27 Abish Investors were induced to purchase GRI Units over a period of approximately six months through a continuing series of misrepresentations and omissions. We note also that the effects of the alleged fraud appear to be continuing—the transactions were highly leveraged and some of the RICO plaintiffs appear to be contractually obligated to pay off the promissory notes on an ongoing basis through 1988. *See* Investors' Memorandum of Law at 40.

■ A related issue that highlights the character of the association in fact "enterprise" alleged here is whether the defendants' predicate acts have a "nexus" to the enterprise with which they are alleged to be associated. *Morgan Stanley*, 719 F.2d at 17. This nexus is present "when (1) one is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of that enterprise." *United States v. Scotto*, 641 F.2d 47, 54 (2d Cir.1980). There is no question in this case that the alleged predicate offenses relate to the activities of the association in fact. Indeed, because the allegations that form the basis of the "pattern" of racketeering activity also form the basis of the "enterprise" alleged, it is the relationship of each of the predicate offenses to the larger plan that shapes the "enterprise" that allegedly operated in this case.

Defendants also assert that the Abish Investors' section 1962(c) enterprise allegation is deficient in that under the plaintiffs' theory of the violation, the RICO "enterprise" and the "person" to be held liable under the statute would be the same. *See, e.g.,* Memorandum in Support of Certain Bank Defendants' Motion at 23. According to some of the bank defendants, for example, the "[f]ailure to distinguish the RICO enterprise from the person sought to be held liable is reason enough to dismiss the Abish Investors' claim." *Id.; see also* Certain Banks' Reply Memorandum at 19.

■ It is true, as defendants point out, that under section 1962(c) a complaint must "distinguish between the enterprise and the person conducting the affairs of the enterprise in the prohibited manner." *Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 315 (2d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). Where a RICO plaintiff alleges that the sole defendant constitutes both the RICO "enterprise" and the "person" to be held liable, his section 1962(c) claim must be dismissed. So, in *Bennett*, in which this situation was presented, the Second Circuit affirmed the dismissal of the RICO claim. The court observed that section 1962(c) "clearly envisions two entities" and that the pleadings in the case had improperly placed the defendant "in both roles"—as the RICO "person" and the RICO "enterprise." *Id.* Similarly, in *Rush v. Oppenheimer & Co., Inc.*, 628 F.Supp. 1188, 1193 (S.D.N.Y.1985), in which the plaintiff claimed that Oppenheimer, a securities brokerage firm, was the "person" to be held liable and that the "enterprise" was Oppenheimer's One New York Plaza Office, the district court dismissed the claim. Judge Sweet observed that "carving out a 'piece' of a corporate defendant to create a distinct 'enterprise' will not satisfy the section 1962(c) requirement that the 'person' and the 'enterprise' be distinct." *Oppenheimer*, 628 F.Supp. at 1194.

■ We believe the pleading deficiencies underscored in *Bennett* and *Oppenheimer* have been avoided here. As we read the Amended Complaint, the "person" sought to be held liable and the "enterprise" would not be the same. This is not a single defendant enterprise. The enter-

prise alleged is an association in fact of a group of corporations and individuals, while the persons to be held liable are the individual defendants who participated in the association by committing predicate acts which related to and furthered the association's purported common purpose. Thus, in our view, the Abish Investors have adequately pleaded the fifth and sixth elements of a RICO violation listed in *Morgan Stanley.*

### 4. Causation

We noted earlier that a civil RICO plaintiff must demonstrate that he has sustained an injury "by reason of a violation of section 1962" in order to state a valid RICO claim. 18 U.S.C. § 1964(c). We are satisfied that the Amended Complaint satisfies the section 1964(c) requirement with respect to all of the defendants except for defendant Peat Marwick. With respect to Peat Marwick, however, the only claim left in the pleadings is the RICO claim based on mail and wire fraud. Amended Complaint ¶ 110C(iii). We have serious doubts as to whether the Abish Investors can prove that the alleged acts of mail and wire fraud caused them to sustain an economic injury. The issue of causation has not been adequately briefed, although its importance is heightened with the dismissal of the securities claim. Accordingly, we reserve decision on the RICO cause of action asserted against Peat Marwick. Peat Marwick is directed to submit a brief on this issue by May 6, 1987. The Abish Investors shall have until May 20, 1987 to submit a memorandum in opposition, at which time the matter will be taken on submission.

For the foregoing reasons, and with the foregoing exception, the motions to dismiss the RICO claims, insofar as those claims are based on 18 U.S.C. § 1962(c), are denied. To the extent that the Amended Complaint purports to allege violations of section 1962(a), those claims are stricken.

### G. Pendent State Claims

### 1. Common Law Fraud

The Banking Parties allege that the Consolidated Complaint fails to state a claim against them for either common law fraud, or aiding and abetting common law fraud. We find that under both Texas and New York law, the complaint states a claim for aiding and abetting. *Compare Channel Master Corp. v. Aluminum Limited Sales, Inc.,* 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833, 835 (1958) *with Stone v. Lawyers Title Insurance Corp.,* 554 S.W.2d 183, 185 (Tex.1977) (elements of common law fraud essentially same).

Both New York and Texas courts have recognized an action for aiding and abetting common law fraud. *See, e.g., Crisp v. Southwest Bancshares Leasing Co.,* 586 S.W.2d 610 (Tex.Civ.App.—Amarillo 1979); *Aeronca, Inc. v. Gorin,* 561 F.Supp. 370, 375–76 (S.D.N.Y.1983). "[T]he general elements of a claim of aiding and abetting fraud are (1) a fraud, (2) defendant's knowledge of the fraud, and (3) defendant's knowing rendition of substantial assistance thereto." *In re Investors Funding Corp. of New York Securities Litigation,* 523 F.Supp. 533, 545 (S.D.N.Y.1980). As was previously discussed in connection with section 10(b), the Investors have adequately pled the elements necessary to establish this claim against the banks. *See, e.g., Freschi v. Grand Coal Venture,* 767 F.2d 1041, 1050 (2d Cir.1985), *vacated on other grounds,* —— U.S. ——, 106 S.Ct. 3325, 92 L.Ed.2d 731 (1986); *Rush v. Oppenheimer & Co., Inc.,* 592 F.Supp. 1108, 1113 (S.D.N.Y.), *vacated in part,* 596 F.Supp. 1529 (S.D.N.Y.1984) (allegations sufficient to establish liability under section 10(b) are also adequate to support a claim of common law fraud). Therefore, defendants' motions are denied.

### 2. Martin Act

On November 13, 1986 in a unanimous decision, the Appellate Division, First Department ruled that there is no implied private cause of action under the Martin Act § 352–C, N.Y.Gen.Bus.Law Art. 23–A (McKinney 1984 & Supp.1986). *CPC International, Inc. v. McKesson Corp.,* 120 A.D.2d 221, 507 N.Y.S.2d 984 (1986). This issue apparently had not been squarely decided previously by an appellate court in this state. The federal cases, including

those from the Second Circuit, cited by plaintiffs and upholding private Martin Act claims, were decided prior to *CPC International* and simply assumed, without facing the issue directly, the existence of such a private right. Under the principles of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), we are bound to follow the Appellate Division on this question of state law. The Investors' Martin Act claims therefore are dismissed in their entirety.

### 3. *Texas Securities Act*

■■■ The Banking Parties and Peat Marwick next move to dismiss the Investors' claims of aiding and abetting under the Texas Securities Act. Although there is a dearth of reported decisions on aiding and abetting liability under that Act, on its face, Article 581–33 F(2) of the Texas Securities Act requires that an alleged aider and abettor have an intent to deceive or act with reckless disregard for the truth or the law. *Tex.Rev.Civ.Stat.Ann.* § 581–33 (Vernon Supp.1986). Furthermore, the aider and abettor must materially aid the seller. *Id.* For the reasons set forth in our discussion of section 10(b) and section 12 of the federal securities laws, with respect to the Banking Parties, we find that the Consolidated Complaint adequately pleads facts from which the existence of each of these elements of fraud can be inferred. *See American General Insurance Co. v. Equitable General Corp.*, 493 F.Supp. 721, 753 (E.D.Va.1980) (using liability under § 10(b) as basis for liability under Texas Securities Act); *Huddleston v. Herman & MacLean*, 640 F.2d 534, 551 n. 27 (5th Cir.1981), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (relying on case law under § 12 to decide liability under Texas Securities Act).

■■■ With respect to Peat Marwick, however, we find no facts alleged that could support a conclusion that Peat Marwick "materially aid[ed]" a seller as is required for aiding and abetting liability on the face of Article 581–33 F. In the absence of any reported Texas or Fifth Circuit decision on aiding and abetting under the Texas Act, we decline to broaden such liability beyond the scope of aiding and abetting liability under federal law. *Cf. American General Insurance Co.*, 493 F.Supp. at 753 (using liability under section 10(b) as predicate for liability under the Texas Act). As we have not found allegations sufficient to make out such liability under federal law, the Texas Securities Act claim must be dismissed as against Peat Marwick.

### 4. *Texas Deceptive Trade Practices Act*

The fifteenth cause of action on behalf of the Allen Investors alleges that defendants violated section 17.46(b) of the Texas Deceptive Trade Practices Act ("DTPA"), *Tex. Bus. & Comm.Code Ann.* § 17.46(b) (Vernon Supp.1987). The Broker and Banking Parties move to dismiss on the basis that the Allen Investors are not "consumers" within the meaning of the DTPA. The statute provides a remedy only for "consumers," who are defined as those who purchase or lease "goods" or "services." *See Tex.Bus. & Comm.Code Ann.* §§ 17.-45(4), 17.50(a).

■■■ Defendants argue that Investors are not consumers because (1) one who seeks to borrow money as investors did here, has not bought goods or services; and (2) the sale of securities is not a sale of goods for DTPA purposes. Defendants' first argument is clearly fallacious under law established by the Texas Supreme Court. Defendants are correct that *Riverside National Bank v. Lewis*, 603 S.W.2d 169, 173–75 (Tex.1980), held that the act of borrowing money from a bank is not the sale of goods or services for purposes of the DTPA. However, subsequent cases clearly confined *Riverside National Bank* to its facts. Under Texas law, a lender may be subject to a claim under DTPA "if the borrower's 'objective' is the purchase or lease of a good or service thereby qualifying the borrower as a consumer." *La Sara Grain Co. v. First National Bank of Mercedes*, 673 S.W.2d 558, 566–67 (Tex. 1984) (citing *Flenniken v. Longview Bank and Trust Co.*, 661 S.W.2d 705 (Tex.1983);

*Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382 (Tex.1982)).

Thus, the issue here turns on defendants' second argument that plaintiffs do not fall within the purview of the DTPA because they purchased securities, and not goods. The federal and state courts of Texas have held that for purposes of the DTPA, a sale of securities is not a sale of goods. *See Allais v. Donaldson, Lufkin & Jenrette,* 532 F.Supp. 749 (S.D.Tex.1982); *Portland Savings and Loan Ass'n. v. Bevill, Bresler & Schulman Government Securities, Inc.,* 619 S.W.2d 241 (Tex.Civ.App.—Corpus Christi 1981); *Swenson v. Engelstad,* 626 F.2d 421, 428 (5th Cir.1980). Furthermore, the *Allais* court specifically held, and defendant banks argue here, that the DTPA is *in pari materia* with the more specific Texas fraud and state securities fraud statutes, and that Investors cannot skirt the due diligence defense available under the more specific securities laws by invoking the strict liability provisions of the DTPA. 532 F.Supp. at 752.

■ We hold that this line of cases is distinguishable from the case at hand and find that the gas reclamation units purchased by Investors are "goods," defined by the DTPA as "tangible chattels or real property purchased or leased for use." DTPA § 17.45(1). As pointed out by the court in *Mbank Ft. Worth, N.A. v. Trans Meridian, Inc.,* 625 F.Supp. 1274 (N.D.Tex. 1985), the cases cited by defendants for the proposition that the securities here are not goods, "dealt with the purchase of stock certificates and certificates of deposit, instruments traditionally understood as securities or intangibles." In *Mbank,* the court found that the security transaction at issue—interests in oil and gas leases—qualified as real property falling under DTPA's

definition of "goods," as well as "securities" under federal and state law. *See also Belton v. Dover Properties Sale, Inc.,* slip op. Civil Action No. 3–85–0557–H (N.D. Tex., July 16, 1985) [Available on WESTLAW, DCT database] (if condominium units purchased for investment purposes fit term of "goods" as well as securities, plaintiffs "may proceed under all of the theories and statutes which the facts are able to support."). Likewise, we find that the gas reclamation units qualify as tangible chattels constituting "goods" under the DTPA, as well as securities under the applicable laws.[6]

Defendants have not cited convincing authority for their assertions that plaintiffs' DTPA claims have been inadequately pled, or that under the facts stated, the DTPA cause of action should be dismissed as a matter of law. Therefore, defendants' motions are denied.

### 5. *Breach of Fiduciary Duty*

■ Austin Davenport has moved to dismiss Investors' Seventh Cause of Action which alleges that the Broker Parties breached fiduciary duties owed to Investors on the grounds that the claim is deficient under Fed.R.Civ.P. 8(a). Investors' allegations that a fiduciary relationship existed between brokers and investors and allegations of specific acts supporting the claim of breach of duty satisfy Rule 8(a)'s requirement for "a short and plain statement" for purposes of a motion to dismiss. *See also, e.g., Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 45 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978) (securities broker owed fiduciary duty to client).

Therefore, defendants' motion is denied.

---

**6.** The *Mbank* court also addressed itself to the issue raised in *Allais,* 532 F.Supp. at 752—whether the sale could give rise to liability and actual recovery under federal and state securities laws as well as the DTPA. *Mbank* pointed out that the Texas Court of Appeals in *Vick v. George,* 671 S.W.2d 541 (Tex.Ct.App.—San Antonio 1983), *aff'd in part and rev'd and remanded in part on other grounds, George v. Vick,* 686 S.W.2d 99 (Tex.1984) (per curiam), recognized that a transaction could fall under both the

Texas Securities Act and the DTPA, but that plaintiff was entitled to but one recovery for the same loss. *See also Tex.Bus. and Comm.Code* § 17.43 ("An act or practice that is a violation of a provision of law other than this subchapter may be made the basis for an action under this subchapter ... if proscribed by a provision of this subchapter....."). This issue was briefed by only one party defendant in passing, is not ripe for determination at this stage of the litigation, and we decline to reach it.

#### 6. DeBlasio's Allegations of Breach of Contract

 Austin Davenport has moved to dismiss Investors' Sixteenth Cause of Action on the basis of Fed.R.Civ.P. 8(a). We believe that DeBlasio's allegations are sufficient to allow defendants to prepare a responsive pleading. Plaintiff alleged the existence of a binding contract and his own contractual performance. *Berend v. J.F. Pritchard & Co.*, 422 F.2d 1247 (5th Cir.), *cert. denied*, 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970); *Landau v. Wolverine Hotel Co.*, 33 F.Supp. 705 (N.D.Ill.1940). The deficiencies cited by defendants, such as plaintiff's failure to specify whether the contract was oral or written, are not in themselves sufficient to defeat plaintiffs' claim at this stage. Defendants' motion is denied.

#### H. Motions under Rule 9 and for a More Definite Statement

##### 1. Rule 9

 We conclude that the Consolidated Complaint is not deficient when viewed in light of the requirements of Rule 9 and deny defendants' motions predicated on a contrary contention.

##### 2. Motion for a More Definite Statement

 The Haas defendants and Banking Parties move under Rule 12(e) that the Investors provide a more definite statement of the claims against them. We disagree with these defendants that the Consolidated Complaint, as it stands, "fail[s] to appraise the defendants of information which would be necessary to raise an intelligent defense." *Mauriber v. Shearson/American Express, Inc.*, 546 F.Supp. 391, 394 (S.D.N.Y.1982). The detailed information sought by the Banking Parties, such as the identification of individual bank representatives who allegedly acted or failed to act, can be obtained relatively easily through discovery. "[A] motion for a more definite statement is not a substitute for discovery." 2A, J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 12.18 at 12–141 to 12–143 (2d ed. 1986). Defendants' motion therefore is denied.

#### I. Service of Process

Defendants Haas, Spira, and Laff contend that the Consolidated Complaint should be dismissed against them for lack of service of process under Fed.R.Civ.P. 4. Investors claim, however, that they served these defendants by mail pursuant to Rule 4(c), although defendants never sent back acknowledgments of service. Defendants dispute this, claiming that Investors merely requested that defendants' attorneys (to whom the Investors sent the complaint and summons) accept service—a request that defendants' attorneys refused. Defendants have participated fully through their attorneys in the proceedings in this case thus far, and have answered the Consolidated Complaint without alleging lack of personal jurisdiction as an affirmative defense.

 The Court finds that there is a factual dispute as to whether service was timely effected as to these defendants that should be resolved following discovery. Defendants' motion to dismiss on that basis is therefore denied without prejudice to renewal.

#### J. Punitive Damages

As part of their claim for relief, Investors seek punitive damages in connection with unspecified claims. The IMC defendants argue that these claims should be dismissed because no allegation in the complaint would justify an award of punitive damages under applicable standards. *See, e.g., Savino v. E.F. Hutton & Co., Inc.*, 507 F.Supp. 1225, 1245 (S.D.N.Y.1981) (punitive damages may be awarded in common law fraud action only when the fraud is gross and evinces high degree of moral culpability). Like the court in *Savino*, we hold that "this is a question that is best resolved at trial, after plaintiffs have presented their proof on the issue." *Id.* at 1245. Therefore, IMC's motion is denied.

### III. FINANCIAL GUARANTY'S MOTION FOR SUMMARY JUDGMENT

Financial Guaranty Corporation and its President, Emmett Barnes (hereinafter col-

lectively referred to as "Financial Guaranty"), are named in only one of the actions consolidated under MDL No. 665, that brought by the Allen Investors. The Consolidated Complaint states claims against Financial Guaranty under section 10(b) of the Securities Exchange Act of 1934 and section 12 of the Securities Act of 1933, as well as common law fraud and the Texas Deceptive Trade Practices Act.

Financial Guaranty's motion to dismiss was converted by this Court into a motion for summary judgment with plaintiffs' and defendants' consent. The standard for summary judgment as recently articulated by the Supreme Court requires that once the moving party has met his burden under Rule 56(c), the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The inquiry conducted is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, — U.S. ——, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). We find that resolution of Financial Guaranty's motion for summary judgment turns on an interpretation of Texas law that merits briefing by the parties. *See id.* 106 S.Ct. at 2510 (only disputes over facts that might affect outcome of suit under governing law will properly preclude summary judgment). Therefore, decision on the motion is reserved pending briefing by the parties on the issues delineated in this Opinion.

### A. *Personal Jurisdiction*

Financial Guaranty and Barnes first contend that the Allen Investors' claims against them, which were instituted in federal court sitting in Texas, should be dismissed for lack of personal jurisdiction. The corporate defendant, which is incorporated in Georgia, and the individual defendant, a resident of Georgia, assert that their contacts with the State of Texas are insufficient for the courts of that state to exercise jurisdiction over them. In support of their position, the defendants cite *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982), for the proposition that the reins imposed on courts by the Due Process Clause in their exercise of personal jurisdiction serve in part to protect defendants' individual liberty and hence against the burden of litigating in an inconvenient forum. *Id.* at 703 & n. 10, 102 S.Ct. at 2104 & n. 10.

Defendants' arguments do not persuade us to disregard the law of the Fifth Circuit, which is applicable to this issue and at odds with the position espoused by defendants. In *Federal Trade Commission v. Jim Walter Corp.*, 651 F.2d 251 (5th Cir.1981), the Fifth Circuit held that in a federal question case where the applicable federal statute provides for nationwide service of process, the Fifth Amendment requires minimum contacts only with the United States, not necessarily with the forum state. A year after that case was decided, the court in *Burstein v. State Bar of California*, 693 F.2d 511 (5th Cir.1982), noted that while the "rationale" of *Jim Walter Corp.* may be undermined by *Insurance Corp. of Ireland, Ltd.*, the "result may well survive." 693 F.2d at 516 n. 8.

Like the statute at issue in *Jim Walter Corp.*, the statute applicable to this case—section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1982)—allows nationwide service of process. *See, e.g., Mariash v. Morrill*, 496 F.2d 1138 (2d Cir.1974). Moreover, nowhere do defendants in this case allege that they have insufficient contacts with the United States. Accordingly, under established Fifth Circuit precedent, we hold that the Texas district court had jurisdiction to maintain the present action. *See also Securities Investor Protection Corp. v. Vigman*, 764 F.2d 1309, [1985–86] Fed.Sec.L. Rep. (CCH) ¶ 92,222 (9th Cir.1985) (squarely holding that minimum contacts with the United States is sufficient under section 27 of the Securities Exchange Act to confer personal jurisdiction over the defendant in any federal district court).

## B. *Section 10(b)*

Count I of the Consolidated Complaint charges Financial Guaranty with aiding and abetting section 10(b) fraud. 15 U.S.C. § 78j(b) (1982). The elements necessary to establish an aiding and abetting claim have been set forth in section II.B. of this Opinion. Financial Guaranty contends that the Allen Investors have provided no support for the allegations of substantial assistance contained in the Consolidated Complaint or in plaintiffs' papers in opposition to this motion for summary judgment. We find that the determination rests on a question of Texas law and reserve decision pending briefing by the parties.

Plaintiffs' allegations of substantial assistance fall into three categories, only the first of which was alleged in the Consolidated Complaint. Paragraph 83[7] of the Consolidated Complaint alleges that Financial Guaranty:

> obtain[ed] reinsurance carriers for the bonds issued by Northwestern. Northwestern would have refused to bond any promissory notes provided by Investors in connection with their purchase of a Unit over a total of $5,000,000.. Financial facilitated in the bonding of over $10,000,000 of Investors' promissory notes by finding reinsurance carriers for said bonds.

In his affidavit, Emmett Barnes denies that Financial Guaranty ever obtained reinsurance carriers for bonds issued by Northwestern. Plaintiffs do not dispute this in their briefs or point the Court to any evidence within their three volume submission that supports that allegation. The Court finds that the existence of this material fact is not in dispute.

The Allen Investors next allege in their initial response to Financial Guaranty's original motion to dismiss that "Barnes distributed false information to reinsurance carriers so that investor notes could be bonded." In connection with this allega-

tion, plaintiffs submit a letter from Barnes to Chubb & Sons Insurance Company which encloses copies of Jordan Program Reports, allegedly containing false financial information on GRI. However, plaintiffs do not allege or point to any facts tending to show that false information was given to an entity that actually provided reinsurance and made financing of Investors' notes feasible.

The case cited by the Allen Investors, *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004 (11th Cir.1985), for the proposition that distribution of false information without verification can be grounds for aiding and abetting liability is distinguishable. In *Woods*, a bank officer made representations to a trustee regarding the bank's past experience with customers who later became the principal defendants in a securities fraud action. The bank officer failed to investigate the veracity of those representations. In holding the bank liable under an aiding and abetting theory, the Court found that the trustee relied upon the representations, and that they caused the trustee to distribute funds to the defendants, resulting in losses to investors. No such reliance and resulting injury has been demonstrated here. The plaintiffs have not come forward with facts showing that Financial Guaranty's transmission of false information resulted in the actual retention of any reinsurance carriers for Northwestern. Leaving aside the equally important issue as to whether plaintiffs have demonstrated the requisite scienter— which remains unaddressed by Investors with respect to this allegation of substantial assistance—we cannot agree that as a matter of law, the transmission of the letter to Chubb in and of itself substantially assisted in the sale of GRI Units and in the commission of a fraud.

Finally, the third act of substantial assistance, which was not posited by the Al-

---

**7.** Paragraph 79 also alleges eight acts of substantial assistance by all defendants other than Peat Marwick. With the exception of the second of these acts concerning Jordan Program Checks, about which more will be said later, the plaintiffs have offered no facts that would tend to show that Financial Guaranty engaged in any of these alleged acts. We therefore will disregard them with respect to Financial Guaranty, the only party moving for summary judgment at this time.

len Investors until their latest Supplemental Response, is the allegation that Financial Guaranty employed an unsuitable agent to obtain for GRI the bonds which insured the investors' notes against default. We find that there is a genuine issue of material fact as to whether Allan Esrine, who had previously been convicted of felony charges under the criminal securities laws, was the agent of Financial Guaranty as evidenced, for instance, by checks made out by GRI for the joint benefit of Financial Guaranty and Esrine. We conclude, however, that whether Investors' allegation is sufficient to establish substantial assistance depends upon a significant question of Texas law.

Investors argue that Esrine, together with GRI sales agents, procured indemnity agreements from Texas investors by which the investors promised to reimburse Northwestern for any sums Northwestern would be obliged to pay in the event an investor defaulted on his note. In support, plaintiffs submitted the deposition of Harold Recard, Assistant Vice-President of Northwestern. Recard testified that Esrine and Financial Guaranty procured the indemnity agreements and signed applications for investor bonds that plaintiffs state were necessary for Northwestern to issue the bonds. *See, e.g.,* Recard deposition at 168–71. Recard further testified that Financial Guaranty acted as Northwestern's agent in these transactions. *Id.* at 175. Recard indicates, and the affidavit of Emmett Barnes corroborates, that Barnes did not deal directly or meet with investors. *Id.* at 168–69; Barnes' Supplemental Affidavit at ¶ 5. It was Esrine who obtained the indemnity agreements from investors, Recard deposition at 169–70, which he transferred in some instances to Financial Guaranty, or in the majority of cases, to their ultimate recipient, Northwestern. *Id.* at 170. The evidence submitted to the Court indicates that Financial Guaranty's activities in this connection consisted of transferring a percentage of the indemnity agreements received from Esrine to Northwestern and obtaining the insurance premium income from GRI, 85 percent of which Financial

Guaranty gave over to Northwestern. Barnes' Supplemental Affidavit at ¶ 5.

Viewing the facts in a light most favorable to Investors and attributing Esrine's actions to Financial Guaranty for purposes of liability under an agency theory—a theory not raised by either party—we find that the acts of procuring indemnity agreements, bond applications, and premium insurance do not constitute substantial assistance. To constitute substantial assistance, the defendants' acts must proximately cause the harm on which the primary liability is predicated. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 62 (2d Cir.1985). The Investors have presented no evidence that the relatively minor role played by Financial Guaranty viewed in isolation proximately caused plaintiffs' allegedly ill-advised investment into GRI. The facts as set forth by the Allen Investors at most demonstrate "but for" causation, an insufficient basis on which to ground aiding and abetting liability under section 10(b). *Id.* at 63.

However, it is when we look to the role of Allen Esrine and his alleged relationship to Financial Guaranty that we find a plausible theory of substantial assistance. The Allen Investors claim that "[s]ubstantial assistance is shown by the use of offering proceeds to pay a convicted felon a fee without making full disclosure to investors how the proceeds of the securities offering were to be used." Allen Investors' Supplemental Response at 11. The substance of this allegation boils down to a charge that Financial Guaranty failed to insure disclosure to investors of the material fact that a felon convicted of securities fraud was being paid with GRI funds in connection with their investments into the corporation. However, as we stated with regard to Peat Marwick's motion to dismiss, omissions or inaction such as this are not considered substantial assistance except when "designed intentionally to aid the primary fraud or [when] in conscious and reckless violation of a duty to act." *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983).

Plaintiffs urge that the Court infer that Financial Guaranty had a duty of disclosure as a result of the mandates of the Texas insurance law, *Tex.Ins.Code Ann.* §§ 21.02–1, 21.07. (Vernon 1981 & Supp. 1987), which place duties on insurance companies and their agents doing business in the state. Plaintiffs point out that "[a] duty of disclosure may exist where ... the law imposes special obligations, as for accountants, brokers, or other experts, depending on the circumstances of the case." *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir.1975); *see also Cleary v. Perfectune, Inc.*, 700 F.2d 774, 777 (1st Cir.1983); *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987). Moreover, where such a fiduciary duty of disclosure exists, recklessness, instead of the stricter standards of knowledge or conscious intent, is sufficient to find aiding and abetting liability. *See Armstrong*, 699 F.2d at 91; *Woodward*, 522 F.2d at 97.

We find, however, that it is unclear from the face of the statute and the parties have not adequately briefed whether the sections of the Texas insurance law cited by plaintiffs impose special obligations on Financial Guaranty sufficient to create a fiduciary duty to Investors. Investors first cite Article 21.02–1. Article 21.02–1 makes any person who "performs any ... act or thing in the making or consumating of any contract of insurance for or with any ... insurance company other than for himself," an agent of that company. Financial Guaranty does not seriously contend that it does not qualify as such an agent: "Barnes' Supplemental Affidavit states unequivocally that Financial Guaranty was an independent insurance agent for Northwestern...." Financial Guaranty's Memorandum of Law in Reply to the Supplemental Response by the Allen Investors at 5.

The next section of the insurance law cited by plaintiffs, article 21.07, imposes duties on those agents defined by section 21.02–1 as well as their principals—insurance carriers licensed to conduct business within Texas. Article 21.07 requires that insurance companies licensed to do business in Texas, such as Northwestern, insure that their agents also obtain licenses to operate within the state. The application for an agent's license must be accompanied by a certificate signed by an "officer or properly authorized representative of the insurance carrier the applicant proposes to represent, stating that the insurance carrier has investigated the character and background of the applicant and is satisfied that he ... [is] trustworthy and qualified to hold himself ... out in good faith to the general public as an insurance agent...." *Id.* Indeed, the application form for agents specifically inquires as to whether the applicant has been convicted of securities fraud.

Financial Guaranty appears not to dispute Investors' contentions that neither Financial Guaranty nor Esrine held such Texas licenses during the period of time that Investors were being bonded. The Court must draw the conclusion that without such licenses neither party was properly conducting insurance activities within the state. However, the parties have failed to brief the Court on whether, in view of all these circumstances, and assuming an agency relationship between Esrine and Financial Guaranty, Financial Guaranty was bound by the Texas law to insure the "trustworthiness" of Allen Esrine, from which the Court could discern a fiduciary duty of disclosure to Investors under the federal securities laws. Specifically, assuming the facts asserted by plaintiffs, the parties have not come forth with legal standards regarding whether Financial Guaranty constituted a "properly authorized representative" of Northwestern under Article 21.07, bound by that law to disclose the background of its own insurance agents acting within Texas.

Furthermore, we find that several other legal points raised by Financial Guaranty's motion for summary judgment merit briefing by the parties. We direct first that the parties submit legal memoranda as to whether Financial Guaranty falls within the reach of section 12 of the securities laws under the facts posited by plaintiffs, including whether Financial Guaranty

could be a "seller" of securities under that law. 15 U.S.C. § 77*l* (1982). Second, the parties are to brief the issue whether the liability provisions of the Texas Deceptive Trade Practices Act (DTPA), *Tex.Bus. & Comm.Code Ann.* §§ 17.41–17.63 (Vernon Supp.1987), are designed to reach the conduct of Financial Guaranty.

Briefs by the moving party, Financial Guaranty, on the aforesaid issues are due to the Court on May 6, 1987. Reply briefs by the Allen Investors are due on May 20, 1987 at which time the motion for summary judgment will be fully submitted to the Court.

## IV. MISCELLANEOUS MATTERS

### A. *Rule 11 Sanctions and Security for Costs*

With respect to all defendants other than Peat Marwick, our denial of their motions to dismiss renders it inappropriate to deal now with their Rule 11 motions. As to those defendants, including Financial Guaranty, whose motion for summary judgment has been reserved for decision, the Rule 11 motions are denied without prejudice to renewal. With respect to Peat Marwick, we defer the Rule 11 application until resolution of the motion to dismiss the RICO count. We similarly deny all motions for costs.

### B. *Matters to be Taken up at Next Conference*

The attorney for GRI has made a motion to withdraw as counsel in this case. Also, the Haas defendants contend that plaintiffs abused the opportunity provided to prepare the Consolidated Complaint by adding party plaintiffs without notifying the Court and without leave of the Court. Haas' motion to dismiss such investors and the motion to withdraw as counsel will be taken up at the next pretrial conference scheduled for this case, which will occur on June 24, 1987 at 4:30 P.M.

## V. CONCLUSION

For the reasons set forth above:

1. The motions to dismiss made by the Banking Parties, Broker Parties, and Northwestern are denied with those exceptions noted below;

2. Defendants' motions to dismiss claims under section 17 of the Securities Act are granted insofar as they apply to claims filed by Investors residing in Texas;

3. All motions by defendants to dismiss claims under New York's Martin Act are granted;

4. Peat Marwick's motion to dismiss is granted as to all claims against it except for the claim alleging violations of RICO, as to which decision is reserved pending briefing by the parties on the issue of causation;

5. Decision on Financial Guaranty's motion for summary judgment is reserved pending briefing by the parties on questions, *inter alia*, of Texas law;

6. Defendants' motions under Rule 9 and for a more definite statement under Rule 12(e) are denied;

7. Defendants' motions for Rule 11 sanctions and Security for Costs are denied as to all parties except Peat Marwick, with respect to whom decision is reserved.

SO ORDERED.